IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRANDON REED,

        Plaintiff,                                          Civ. No. 3:16-cv-01007-MC

        v.                                                OPINION AND ORDER

NANCY A. BERRYHILL,
Acting Commissioner of the Social Security,

        Defendant.

_____

MCSHANE, Judge:

Plaintiff Brandon Reed brings this action for judicial review of the Commissioner's decision denying his application for supplemental security income (SSI). This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

Reed, now 23 years old, has no physical limitations. The question is whether Reed's mental impairments preclude him from sustaining employment in any job with simple, routine tasks as of April 16, 2013. After two hearings, the administrative law judge (ALJ) determined Reed is not disabled. Tr. 28.[1] Because the ALJ erred in rejecting the opinions of the examining psychologists, the Commissioner's decision is REVERSED and this matter is remanded for calculation of benefits.

---

[1] "Tr." refers to the Transcript of Social Security Administrative Record, ECF No. 10, provided by the Commissioner.

1 – OPINION AND ORDER

## BACKGROUND

Throughout his academic career, Reed has required special assistance. Even prior to kindergarten, Reed received special education services. Tr. 556. His mental limitations required him to repeat the first grade three times. Tr. 546. By high school, Reed had fallen even further behind. In the 9th grade, despite earning an A in physical education, Reed could achieve only a 1.64 GPA. Tr. 306. In the 10th grade, with no PE class to boost his GPA, Reed could only manage a 1.29 GPA. Tr. 306. Reed transferred to a school for students with special educational needs, and continued his path to receiving a modified diploma with the aid of an Individualized Education Program (IEP).[2] With significant accommodations and extra assistance provided by the school under the IEP, Reed received a modified diploma on April 15, 2013, two months shy of his 20th birthday.

After being found disabled as a child as of June 1, 2000, Reed received SSI through April 15, 2013, the day he received his modified diploma. Under the regulations, Reed had to be reevaluated for SSI upon graduating from high school. Therefore, Reed need only demonstrate he was disabled at some point between April 16, 2013, the day after he graduated, and November 26, 2014, the date of the ALJ's decision.

Reed took part in several psychological examinations as part of his reevaluation for SSI. Dr. Jane Starbird conducted the first evaluation in September 2011. Tr. 449.[3] Dr. Starbird commented on Reed's symptoms but did not offer an opinion as to Reed's mental Residual Functional Capacity (RFC). Later that month, reviewing psychologists formulated Reed's mental

---

[2] A modified diploma is available "only to students who have demonstrated the inability to meet the full set of academic content standards for a high school diploma with reasonable modifications and accommodations. Or. Rev. Stat. 329.451(7) (2015). To be eligible, the student must "Have a documented history of an inability to maintain grade level achievement due to significant learning and instructional barriers or have a documented history of a medical condition that creates a barrier to achievement." *Id.*
[3] Reed was evaluated in 2005, but that evaluation is not at issue here. Tr. 545-46.

RFC based on Dr. Starbird's evaluation, Reed's school records, and lay witness testimony. Tr. 454, 468.

One year later, two examining psychologists and a treatment provider proffered opinions that suggested Mr. Reed's limitations were greater than those put forth by the reviewing psychologists. Dr. Karla Causeya examined Reed and formulated a mental RFC based on her own examination, as well as the evidence considered by the reviewing psychologists. Tr. 498-511. Daniel Donohue, a mental health therapist who treated Reed for nearly a year, wrote a letter describing Reed's symptoms and limitations as of August 2012. Tr. 514. In November 2012, Dr. William Sack examined Reed, agreeing completely with Dr. Causeya's "excellent report." Tr. 523.

Everyone agrees Reed suffers from pervasive developmental disorder and borderline intellectual functioning. The ALJ concluded Reed could perform a full range of work given that the work require only simple, routine tasks, and that Reed only have incidental public contact and only occasionally engage in teamwork. Tr. 23. In reaching that determination, the ALJ gave great weight to the reviewing psychologists' opinions, and little weight to Dr. Causeya's opinion. After the ALJ issued the decision finding Reed not disabled, Reed submitted a December 2014 evaluation from yet another examining psychologist, Dr. Caleb Burns. Tr. 649-661. Like Dr. Sack, Dr. Burns fully endorsed Dr. Causeya's opinions. Tr. 661.[4] Notably, only the reviewing psychologists offered a mental RFC suggesting Reed was capable of sustaining employment for any length of time.

---

[4] The parties agree that because the Appeals Council considered Dr. Burns's report, it is part of the record on appeal and I must consider it in determining if the ALJ's decision was supported by substantial evidence. *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).

The issue here is whether the ALJ provided specific and legitimate reasons, supported by substantial evidence in the record, for rejecting Dr. Causeya's limitations. As discussed below, the ALJ erred in not giving Dr. Causeya's opinion controlling weight. Because that opinion—which is supported by the opinion of every other psychologist who later examined Reed—establishes that Reed is disabled under the act, this matter is remanded for an award of benefits.

## STANDARD OF REVIEW

The reviewing court shall affirm the Commissioner's decision if the decision is based on proper legal standards and the legal findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012) (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). To determine whether substantial evidence exists, we review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. *Davis v. Heckler*, 868 F.2d 323, 326 (9th Cir. 1989). "If the evidence can reasonably support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the Commissioner." *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 523 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir. 1996)).

## DISCUSSION

The Social Security Administration utilizes a five step sequential evaluation to determine whether a claimant is disabled. 20 C.F.R. §§ 404.1520 & 416.920 (2012). The initial burden of proof rests upon the claimant to meet the first four steps. If claimant satisfies his or her burden with respect to the first four steps, the burden shifts to the Commissioner for step five. 20 C.F.R.

§ 404.1520. At step five, the Commissioner's burden is to demonstrate that the claimant is capable of making an adjustment to other work after considering the claimant's residual functional capacity (RFC), age, education, and work experience. *Id.*

The ALJ found Reed had the RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations: that Reed perform only simple, routine tasks and have only incidental public contact, and only occasionally engage in teamwork. Tr. 23. In making that finding, the ALJ relied heavily on the opinions of the reviewing psychologists:

> The State agency psychologist consultants' opinion that the claimant would perform simple tasks with limited public contact is given significant weight because it is consistent with the evidence of record, including cognitive testing and school reports, as well as the claimant's documented activities that include writing, music, spending time at the mall with friends, and household chores.

Tr. 26 (internal citations omitted).

Dr. Causeya, who examined Reed after the reviewing psychologists formulated their opinions, came to a different conclusion. As relevant here, Dr. Causeya opined Reed would have moderately severe limitations with the following: maintaining attention and concentration for at least two straight hours with at least four such sessions in a workday; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being distracted; and completing a normal workday without interruptions from psychologically based symptoms and performing at a constant pace without an unreasonable number and length of rests. Tr. 510. "Moderately Severe" limitations indicate that while the activity is not totally precluded, it can be engaged only occasionally during the eight-hour work day; i.e., for no more than two total hours each work day. Tr. 509. The question is whether the ALJ erred in according more weight to the reviewing psychologists' opinions than to Dr. Causeya's opinion.

Where there exists conflicting medical evidence, the ALJ is charged with determining credibility and resolving any conflicts. *Chaudhry v. Astrue*, 688 F.3d 661, 671 (9th Cir. 2012). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence. . . ." *Id.* (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Generally, a treating doctor's opinion is entitled to more weight than an examining doctor's opinion, which in turn is entitled to more weight than a reviewing doctor's opinion. *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).

Everyone agrees Reed has severe impairments. The issue is whether he can perform simple tasks day in and day out. There is a reason the regulations require that, all things being equal, opinions of examining doctors are generally entitled to more weight than those of reviewing doctors. This is especially true in cases turning solely on a claimant's mental impairments. Of those who formulated a mental RFC for Reed, Dr. Causeya was the only one to sit down and conduct an in-person examination with Reed. The examining psychologists, with the possible exception of Dr. Starbird, each agreed Reed would be unable to hold down a job, even one where he only dealt with simple tasks. Those examining psychologists' opinions as to Reed's mental limitations are, by far, the best evidence available as to what exactly Reed is capable of. In studying the reports of the psychologists, the transcripts of the hearings, and Reed's educational records, it becomes clear that substantial evidence does not support the ALJ's decision giving great weight to the reviewing psychologists' opinions that Reed can perform simple, routine work. I turn first to Dr. Causeya's report.

In forming her remarkably detailed, 11-page report, Dr. Causeya ran Reed through a battery of tests, and supplemented those results with her own observations of Reed, along with

6 – OPINION AND ORDER

interviews of Reed's mother and grandfather. Tr. 499. Dr. Causeya administered the following tests: Wechsler Adult Intelligence Scales, fourth addition (WAIS); Adaptive Behavior Assessment System, second addition; Wide Range Achievement Test, fourth addition; Blue Word Reading List; Color Trails Test; PHQ-9 Patient Depression Questionnaire; and Test of Memory Malingering. Tr. 499.[5] During her interview, Reed's mother reported several things: although Reed spoke of writing music and forming a band, his mother never met any potential band members and did not think Reed ever met with any band members; Reed seldom left the house alone, or even rode the bus, for fear of being assaulted or killed; Reed's only real acquaintances were family members; and Reed spent most of his time isolating on the computer. Tr. 450. Reed's mother confirmed that Reed never developed typical friendships and that the few acquaintances Reed brought to the house ended up stealing Reed's belongings or coercing Reed into simply giving away his belongings. Tr. 501.

Dr. Causeya noted Reed had a "Marked impairment in the ability to initiate or sustain a conversation with others. (Brandon will initiate a conversation; however, he is unable to sustain a conversation and stops abruptly or jumps to another topic without taking into consideration the person he is talking with.)" Tr. 501. Although Reed cooperated with the interview, "his responses were quite simple and lacking in content." Tr. 502. Reed exhibited limited interpersonal skills and eye contact, which were not age appropriate. Tr. 502. As discussed below, other psychologists would make identical observations. Reed's activity level during the interview was unremarkable and, in an observation that becomes even clearer after reading the transcripts, school records, and other examining reports, Reed often "would make statements

---

[5] Dr. Starbird administered only the WAIS. Tr. 449. As noted, the reviewing psychologists based their opinions largely on Dr. Starbird's report, the only report of an examining psychologist available at the time they formed their opinions.

7 – OPINION AND ORDER

which sounded more like a cliché, or something he had heard someone else say, rather than being authentically his own. For example, he would say things such as, 'I like to do things that get me motivated and inspired.'" Tr. 502. These clichés, or perhaps a lack of insight, or simply a desire to say anything at all, appear to be a recurring theme with Reed. For example, unable to perform subtraction of serial threes, Reed told Dr. Causeya, "I like to do it in my head." Tr. 502.

There is ample—and overwhelming—evidence demonstrating Reed lacked the ability to construct realistic goals. Reed wanted to start a clothing line, but had no experience being employed, let alone running a business, and produced only vague responses to Dr. Causeya's questions about what sort of clothes he would develop. Tr. 500. Reed expressed an interest in becoming involved in famous art exhibits or working in the music business. Tr. 500. Despite telling Dr. Causeya he had written over 200 songs, Reed was unable, when prompted, to recite a single lyric of any of his alleged songs. Tr. 500.[6] Much more likely is the probability that while Reed dreamed of writing songs, opening a clothing business, or working in the art world, his impairments prevented him from realizing how far these dreams were from reality.

Even seemingly simple things proved too much for Reed. While he knew the date and could name the president, he could not recall either Dr. Causeya's name or the area of the city her office was located. Tr. 502. The ideas he expressed were uniformly simple in complexity, and Reed was quite limited in his ability to expound on presented hypotheticals.

> For example, when asked what he would do in an emergency fire scenario he responded that he would go to the nearest exits. He did not express any awareness for the safety of others. When asked what he would do if he found a stamped, addressed envelope, lying on the sidewalk, he stated that he would find the

---

[6] This was not the only time Reed could not recall a lyric to any of his alleged 200 original songs. At the first hearing before the ALJ, Reed was asked to name one song or some lyrics to any of his songs. Reed responded, "I wouldn't [] really know, like I can't memorize it, like 200 and something lyrics, like songs I do, yeah." Tr. 78.

address, and ask for directions. . . . When asked what the saying meant, "Don't count your chickens before they're hatched," he replied that he did not know.

Tr. 502.

Dr. Causeya clearly reviewed Reed's school records, writing "Notes from his teachers at school indicated that he relies on others to guide him through his assignments and does not function at school independently." Tr. 503. Importantly, Dr. Causeya noted, "Brandon's appearance is adequate, although his ability to interact socially is limited." Tr. 503. One suspects the ALJ looked at Reed's normal appearance, listened to Reed's remarkably frank (if entirely unrealistic) testimony at the hearings, and simply determined Reed was not disabled. Perhaps Reed's mother put it best when she told Dr. Burns, "When they had a Social Security hearing for him, they went by what he said he could do, but he was saying he could do things that he can't." Tr. 657. At the hearing, the ALJ inquired as to why Reed had not looked for a single job since graduating several months earlier:

> Q: I guess I don't understand why you haven't tried to find one? Just don't need the money?
>
> A: Just—I just think like it's not any good jobs that I really want at the moment.
>
> Q. What jobs would you want?
>
> A: Like a job where I can work with like musicians and like music producers and stuff like that.

Tr. 47.

After Reed informed the ALJ his then-girlfriend was looking for a job, the ALJ inquired again as to Reed's reasons for not even attempting to secure employment:

> Q: You won't?
>
> A: No.
>
> Q: You need a certain kind of job?

9 – OPINION AND ORDER

> A: Yeah.
>
> Q: Why? You're too good to do some jobs?
>
> A: Pretty much, I mean it's like I don't consider like most jobs that they pay really well, so—
>
> Q: Yeah?
>
> A: Yeah.
>
> Q: You think somebody else should pay you for not working?
>
> A: I wouldn't say that. I'll just say that—
>
> Q: Well, isn't that what you're asking?
>
> A: No.
>
> Q: You don't want me to give you money?
>
> A: I mean it'd be good for—to help me get on my feet and to get an apartment and I'd say probably to look for a job but—
>
> Q: What's stopped you from looking for a job so far? Nothing apparently?
>
> A: Well, just being in like Portland for so long, I just don't like the city, the people, just don't give me any opportunities here and it's just not my type of city to be in.

Tr. 48.

> Reed mentioned his oft-repeated dream of starting his own business to the ALJ:
>
> The kind of workforce that I would like to work in would be like making my own clothing, like my own company, starting that by myself. And I have tried to like get people to, you know, work with me to start it.
>
> But a lot of people just don't—they kind of let me down. So I don't really like to work well with people, like I don't work well with people at all. So that's why I would probably need the money also to start my own business.

Tr. 59.

I have rarely, if ever, encountered a social security claimant admitting to such a strong desire to enter the workplace. In reading the transcripts, one could assume at first glance that

10 – OPINION AND ORDER

Reed is merely attempting to game the social security process. But anyone reading the four psychological evaluations in the record, along with the comments from Reed's teachers, would understand that Reed's statements were simply pie-in-the-sky dreams rather than any accurate prognostications on his future options. Dr. Causeya was correct in concluding, "He is unable to express any realistic ideas for future work. Instead, he would like to be in a famous art exhibit, or develop a clothing line. He talks about being in a band and writing songs, but there is no apparent evidence of this." Tr. 506. Reed's unrealistic statements are symptoms of his limitations and strengthen, rather than detract from, his disability claim. The results of Dr. Causeya's examination reveal Reed faces significant hurdles to work even a simple job, let alone to start his own business.

WAIS testing revealed Reed had an IQ of 73, in only the 4th percentile. Tr. 504. Testing revealed Reed read at a 6th grade level. Tr. 505. Reed's ability to problem solve, or complete tasks in a timely manner, fell in the borderline range. Tr. 505. Several other findings made by Dr. Causeya are highly relevant to Reed's ability to perform simple tasks:

> School records indicate that Brandon has required specialized assistance in order to complete his assignments. He does not function well completing his school work independently. He requires the support of others to stay on task. . . . Brandon is exposed to very little change in his routine. He essentially isolates with his computer, and does not navigate the community independently. He would have difficulty adapting to expected or unexpected changes. . . . While Brandon has not yet been employed, he needs special assistance in order to complete modified academic tasks. He has not exhibited typical development in his ability for social interaction, instead exhibiting symptoms of a Pervasive Developmental Disorder. He would be expected to have difficulty reading social cues and other aspects of the work environment.

Tr. 506.

Ultimately, Dr. Causeya diagnosed Pervasive Developmental, NOS, and Borderline Intellectual Functioning. Tr. 507. Dr. Causeya assigned Reed a GAF of 45. Reed's inability to

11 – OPINION AND ORDER

progress in school, even with specialized assistance, applied equally to a work setting. Tr. 507 ("his abilities make it difficult for him to acquire new information, as well as to problem solve, and apply information in work-like or academic settings.").

The ALJ gave little weight to several of Dr. Causeya's opinions.

> I again decline to give significant weight to the July 2012 opinion of Dr. Causeya, who assessed moderately severe limitations in the claimant's ability to understand, carry out, and remember detailed instructions; to maintain concentration for at least two hours with at least four such sessions in a workday; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted; and to complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rests (Ex. 9F). The limitations are given some weight because they are generally consistent with the residual functional capacity for simple work with additional limitations in social functioning; however, the claimant's documented activities, including reading, writing, drawing, and graduating from high school all establish a greater capacity for concentration than alleged.

Tr. 26.

None of the above limitations are "generally consistent" with an RFC for simple work. When Dr. Causeya offered her opinion that Reed had "moderately severe" limitations in the above categories, she opined Reed could only occasionally partake in the activity for a short time, such as 5-15 minutes at a time, "not totaling more than two hours in an eight-hour day." Tr. 509. A valid RFC covers a claimant's ability to perform activities "on a regular and continuing basis." 20 C.F.R. § 404.1520(e). The regulations define "regular and continuing basis" as eight hours per day in a five-day workweek. Soc. Sec. Ruling. 96-8p, at *1. To conclude the above "moderately severe" limitations are "generally consistent" with simple work is clear error.

The ALJ erred in additional ways. For example, the ALJ concluded that in contrast with Dr. Causeya's opinion of moderately severe limitations, she noted Reed's attention and concentration were adequate on examination. The examination, however, covered a discrete

12 – OPINION AND ORDER

amount of time. In contrast, Dr. Causeya evaluated Reed's limitations "within the context of the individual's ability to sustain that activity over a normal workday and week," with "strong consideration" given to Reed's "ability to consistently sustain the activity, eight hours per day, five days per week." Tr. 509 (emphasis omitted). There is a great difference between the ability to concentrate on multiple examinations over a one-to-two hour period, and the ability to sustain that concentration over a regular work week. Licensed psychologists are presumed to differentiate between the two.

Essentially every reason the ALJ gave to reject Dr. Causeya's opinion falls apart upon further scrutiny. As Dr. Causeya performed more tests on Reed, wrote more detailed notes of her examinations, and backed up her opinions with more pages of analysis than any other psychologist, there are significant problems behind the ALJ's reasoning. The ALJ concluded:

> Dr. Causeya assessed moderately severe limitations in the claimant's ability to set realistic goals or make plans independently and to travel in unfamiliar settings and use public transportation. She indicated that additional stressors would likely increase the claimant's limitations, and checked a box stating that routine, repetitive, simple work would "actually serve as a stressor" that would exacerbate the claimant's symptoms. <u>These limitations are not given weight because they are not accompanied by any support or examination and appear to have been based in large part on the subjective reports of the claimant and his mother, which are not fully credible.</u>

Tr. 26 (emphasis added).

I covered Reed's inability to make realistic goals and plans above. There is no need to rehash those limitations here other than to note these comments from the ALJ support the idea that the ALJ took Reed's statements about wanting to work at face value. The ALJ's statement that Dr. Causeya did not support her limitations with any support or examination is boilerplate language that ignores the record. As described above, Dr. Causeya had Reed complete seven tests, many more than any other psychologist in the record. Dr. Causeya wrote an 11-page report

13 – OPINION AND ORDER

discussing her opinions and findings. She supplemented that report with a three page assessment of Reed's mental RFC. In contrast, Dr. Starbird's report, heavily relied upon by the reviewing psychologists, consists of a four page report detailing Reed's performance on the WAIS.[7] To say any of Dr. Causeya's opinions "are not accompanied by any support or examination" simply distorts the record.

Likewise, the ALJ's conclusion that the above limitations were based on the subjective (and not credible) reports of Reed and his mother, and are therefore entitled to little weight, is not supported by the record. The ALJ is correct that Reed and his mother stated Reed does not travel in unfamiliar settings or use public transportation. The error is finding these statements not fully credible. The record is consistent, with statements over several years from Reed, his mother, and his grandfather, that while Reed may venture to one particular mall on occasion, he rarely goes anywhere by himself. Tr. 47, 50-51, 72, 83, 450, 500, 506, 657, 660. Asked at the hearing why he did not feel nervous at that mall, Reed explained that only younger kids hang out at the mall. Tr. 52. Reed also explained that while he went to the mall, he does not go there often, with his last visit there being three weeks before the hearing. Tr. 69. While Reed may occasionally go to the mall, the record is clear that Reed seldom goes to unfamiliar places and does not use public transportation.[8]

The ALJ disregarded Dr. Causeya's opinion in favor of that of the reviewing psychologists, who believed Reed capable of simple work. The ALJ concluded the opinions of

---

[7] The WAIS is one of the seven tests Dr. Causeya had Reed complete.
[8] Not once did Reed arrive alone for an examination. On every occasion, Reed's mother or grandfather accompanied him.

14 – OPINION AND ORDER

the reviewing psychologists were consistent with the record as a whole, including cognitive testing and school reports, and consistent with Reed's activities of daily living.[9]

As noted, the reviewing psychologists based their opinions largely on the report of Dr. Starbird, who examined Reed in September 2011, the same month the reviewing psychologists formed their opinions. The reviewing psychologists did not take into account the opinions of Drs. Causeya, Sack[10], or Burns, as those psychologists examined Reed after the reviewing psychologists formed their opinions. Likewise, the reviewing psychologists did not have the benefit of the August 2012 letter from Daniel Donohue, Reed's mental health therapist. Tr. 514.

The ALJ erred in assigning more weight to the reviewing psychologists on the basis that their opinions were more consistent with cognitive testing in the record. Dr. Causeya had Reed perform 7 tests, including the WAIS. Dr. Starbird only had Reed perform the WAIS. And unlike Dr. Causeya, Dr. Starbird did not construct a mental RFC for Reed. As Dr. Causeya performed the most complete examination of Reed, and used those results to construct a mental RFC for Reed, the ALJ erred in rejecting her opinion in favor of that of the reviewing psychologists, who relied on very little in the way of cognitive testing in forming their opinions.

Additionally, Dr. Causeya made numerous references to teacher notes and school records in her report. Those records provide further support for her opinion and demonstrate the reviewing psychologists painted a rosier picture of Reed's abilities than that supported by Reed's academic records. Reed's May 2011 IEP noted that while he had made improvements in certain areas, this improvement was due to daily one-on-one help from teachers. Tr. 309. The IEP notes

---

[9] As described above, Reed's limited activities of daily living are not transferrable to a work setting and are not inconsistent with his other testimony, and are therefore not a valid reason to rely on the opinions of the reviewing psychologists. *Orn v. Astrue*, 495 F.3d 625, 693 (9th Cir. 2007) (daily activities may support adverse credibility finding if the activities are transferrable to a work setting).

[10] Dr. William Sack examined Reed in November of 2012. Tr. 522. Dr. Sack is not to be confused with Dr. Gary Sacks, who examined Reed in 2005. Tr. 545.

15 – OPINION AND ORDER

Reed continued to have "difficulty with removing himself from situations that may lead him to making a poor decision." Tr. 309. Reed continued to require the need to leave the classroom when anxious or agitated, Tr. 309, and he could be outside of the class 20% of the day, Tr. 316. Reed required extensive modifications in virtually every academic area. Tr. 316. Despite increasing participation, Reed's reading comprehension and math skills were at the 4th or 5th grade level. Tr. 318. An April 2011 psycho-educational report noted Reed asked teachers for assistance but "at times he becomes easily frustrated and will need extra encouragement to re-engage. He also takes a break to problem solve when needed with a teacher." Tr. 334. The note confirms Reed "is a very sensitive young man[.]" Tr. 334.

In January 2012, Reed's teacher completed a questionnaire. Reed's reading and math skills fell below the 10th percentile. Reed's teacher specifically noted Reed required a "Great need for structure" and required 1-3 periods daily of time outside the classroom. Tr. 377. The reviewing psychologists did not have these comments from Reed's teacher when they formed their opinions. Although the teacher noted Reed only had slight problems with paying attention, focusing long enough to finish a task, refocusing, carrying out single-step instructions, and working without distracting himself or others, he based the ratings on Reed's modified assignments and confirmed Reed would be more limited if given regular, age appropriate assignments. Tr. 378. Reed had obvious problems with respecting authority figures, Tr. 379, and a serious problem with handling frustration appropriately, Tr. 380.

Substantial evidence does not support the ALJ's conclusion that Reed's school records support the reviewing psychologists' opinions that Reed could perform simple tasks. In contrast to the reviewing psychologists, Dr. Causeya specifically commented that "Notes from his teachers at school indicated that he relies on others to guide him through assignments and does

16 – OPINION AND ORDER

not function at school independently." Tr. 503. She noted Reed needed special assistance to complete modified academic tasks, did not function well in school independently, and required the assistance of teachers to stay on task. Tr. 506. In forming Reed's prognosis, Dr. Causeya again relied heavily on Reed's academic records and notes:

> A Pervasive Developmental Disorder is expected to be expressed throughout the lifespan. It is expected that Brandon's level of functioning will continue to be in the Extremely Low range, as evidenced by standardized ratings of his adaptive functioning, as well as by his functioning within the special education curriculum at school. Even though he has had specialized assistance at school, he has not yet obtained credits to receive a modified diploma. His intellectual functioning, in the Borderline range, is not expected to change over the lifespan, and his abilities make it difficult for him to acquire new information, as well as to problem solve, and apply information in work-like or academic settings.

Tr. 507.

Dr. Causeya's opinion is not only backed up by extensive cognitive testing and Reed's school records, it is also strongly supported by the other examining psychologists. In November 2012, Dr. William Sack examined Reed. Tr. 522. Like Dr. Causeya, Dr. Sack mentioned Reed's desire to work in the music business "but his plans were nospecific and global. During our meeting his ideas often wandered off and became somewhat circumstantial to the topic at hand." Tr. 523. Dr. Sack opined, "This boy needs continued supportive therapy. His progress will be slow but he will need external help to function in society. He will not be able to live independently for the foreseeable future." Tr. 524. Dr. Sack agreed completely with Dr. Causeya's opinions, noting her "impressions of this boy agree with mine in that this child has all the symptoms of a pervasive developmental disorder and borderline intellectual functioning. Her excellent report substantiates my impressions completely."[11] Tr. 523.

---

[11] The ALJ concluded that Dr. Sack's findings "are largely similar to those documented in earlier records, and are consistent with the limitation to simple work with limited social contact and collaboration." Tr. 24. I disagree.

17 – OPINION AND ORDER

Dr. Caleb Burns examined Reed in December 2014. He quoted fairly extensively from Dr. Causeya's report and, as with Dr. Sack, his own opinions aligned with those of Dr. Causeya. Dr. Burns noted Reed's symptoms would impact his ability to succeed in the workplace:

> Mr. Reed's response pace was extremely slow and I very often had to repeat questions to him. Before he would respond, he would consistently have a very long response pace and also would use much facial mobility. This very slow response pace would be very frustrating for those interacting with him.

Tr. 658.

Reed suffered from poor insight and judgment. "He clearly continues to need the structure and support provided to him by others." Tr. 658. Dr. Burns emphasized Reed's "very unusual speaking mannerisms, with extremely long pauses in his speech before he would answer questions, frequent mumbling in his speech, etc. Those interacting with him will find this manner of interacting to be extremely frustrating." Tr. 660. These symptoms would impact Reed's ability to sustain employment:

> Mr. Reed's PDD, NOS-related limitations greatly restrict his ability to interact with others in an appropriate fashion. Almost certainly this style of interaction has very negatively impacted his educational career and it would hugely impact any employment situation he is placed in.[12]

Tr. 660-61.

Due to the veritable mountain of evidence in the record supporting Dr. Causeya's opinion, and the dearth of any contrasting evidence or opinions, the ALJ erred in rejecting Dr. Causeya's opinions in favor of those from the reviewing psychologists. Specifically, the ALJ erred in rejecting Dr. Causeya's opinion that Reed had moderately severe limitations in:

---

[12] Reed's mental health therapist agreed Reed's symptoms would limit his employment options: "It is my opinion that [a learning disorder and possibly ADHD] greatly limit Brandon's ability to process social stimuli which frustrates his family, peer and school relationships resulting in delayed academic completion, repetitive periods of isolation from peers and creating housing instability from time to time. It is thought that such limits and frustration would impact Brandon equally in any social setting such as a work setting specifically with bosses, peers and clients." Tr. 514.

18 – OPINION AND ORDER

maintaining concentration for at least two hours with at least four such sessions each workday; sustaining an ordinary routine without special supervision (and without becoming distracted); and completing a normal workday without interruptions and performing at a consistent pace without an unreasonable number and length of rests. Tr. 26. In the Ninth Circuit:

> Remand for further administrative proceedings is appropriate if enhancement of the record would be useful. Conversely, where the record has been developed fully and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits. More specifically, the district court should credit evidence that was rejected during the administrative process and remand for an immediate award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004); *see also Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014).

Credited as true, Dr. Causeya's opinion confirms Reed is unable to sustain consistent employment, even when that job requires Reed to complete only simple tasks. The vocational expert confirmed one who is unable to sustain an ordinary routine without supervision for more than two hours in a workday could not perform the jobs. Tr. 56. Additionally, someone who is unable to maintain concentration and attention for more than two hours (without supervision) in a workday could not maintain employment. Tr. 57. Because on remand the ALJ would be required to find Reed disabled, remand for an award of benefits is appropriate. *Benecke*, 379 F.3d at 593.

/ / / /

/ / / /

/ / / /

## CONCLUSION

The ALJ erred in rejecting the opinion of Dr. Causeya. Credited as true, Dr. Causeya's mental RFC establishes Reed is disabled as of April 16, 2013. The Commissioner's decision is REVERSED and this matter is remanded for calculation of benefits.

IT IS SO ORDERED.

DATED this 12th day of February, 2018.

    /s/ Michael McShane
Michael McShane
United States District Judge